UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MAETTA VANCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:06-cv-1452-SEB-JMS |
| vs. | ) | |
| | ) | |
| BALL STATE UNIVERSITY, WILLIAM | ) | |
| KIMES, in his individual and official | ) | |
| capacity as General Manager of Ball State | ) | |
| University's Banquet and Catering | ) | |
| Department, SAUNDRA DAVIS, in her | ) | |
| individual and official capacity as a | ) | |
| supervising employee of Ball State | ) | |
| University's Banquet and Catering | ) | |
| Department, KAREN ADKINS, in her | ) | |
| individual and official capacity as the | ) | |
| Assistant Director of Administration/ | ) | |
| Personnel/Marketing for Residence Hall | ) | |
| Dining Service at Ball State University, and | ) | |
| CONNIE MCVICKER, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON PENDING MOTIONS**

This cause is before the Court on cross-motions for summary judgment.

Defendants Ball State University ("Ball State"), Bill Kimes, Saundra Davis, Karen

Adkins, and Connie McVicker, filed a Motion for Summary Judgment [Docket No. 54]

on November 1, 2007.  Subsequently, on November 30, 2007, Plaintiff, Maetta Vance,

filed a Motion for Partial Summary Judgment [Docket No. 74] on her hostile environment

claim.  Ms. Vance also filed a Request for Oral Argument on Cross Motions for Summary

Judgment [Docket No. 77] on that date.[1]  After the cross-motions were fully briefed, on

March 12, 2008, Ms. Vance filed supplemental affidavits and evidence in support of her

motion for summary judgment and opposing Defendants' motion for summary judgment.

On March 17, 2008, Defendants filed a Motion to Strike [Docket No. 125] Ms. Vance's

additional submissions.

For the reasons detailed in this entry, we <u>GRANT</u> Defendants' Motion to Strike,

<u>GRANT</u> Defendants' Motion for Summary Judgment in its entirety and <u>DENY</u> Plaintiff's

Partial Motion for Summary Judgment.


**<u>Factual Background</u>**

In August 1989, Plaintiff, Ms. Vance, an African American female, began working

for Ball State as a substitute server in the University Banquet and Catering ("UBC")

division of University Dining Services ("Dining Services").  Compl. ¶¶ 12-13; Rubrecht

Aff. ¶ 3.  Dining Services employs approximately 850 individuals across seven residence

hall dining units and other restaurants on campus in such positions as food preparation,

wait staff, truck driving, and maintenance, among other divisions.  Rubrecht Aff. ¶ 2.  Ms.

Vance was first promoted by Ball State in November 1991 to a part-time catering

assistant position.  Defs.' Mem. at 5.  She was subsequently selected as a full-time

---

[1] Plaintiff's Request for Oral Argument is hereby <u>DENIED</u>.  The briefings in this cause are both thorough and prolix.  Therefore, we are able to reach our decision based upon these pleadings, and oral argument on the issues before us is unnecessary.

catering assistant in January 2007, which is the position she currently holds.[2]  Vance Dep. at 21.

Jon Lewis acts as the Director of Dining Services and heads the entire operation. Rubrecht Aff. ¶ 2.  He is assisted by the Assistant Director of Personnel, Training, and Administration, Karen Adkins, who directly reports to Mr. Lewis.  Id.  Both Mr. Lewis and Ms. Adkins supervise Bill Kimes, who serves as the General Manager of UBC (one division of Dining Services) and also oversees the operation of Cardinal Crossing, a food court that serves both students and employees.  Kimes Dep. at 8-9.  Overall, Mr. Kimes supervises nearly 140 employees – eighty from Cardinal Crossing, and sixty from UBC, including Ms. Vance.  Id. at 26; Rubrecht Aff. ¶¶ 4-5.  Mr. Kimes has supervised Ms. Vance since 1999, when he first began working for Ball State.  Kimes Dep. at 26.

The instant suit arose as a result of Ms. Vance's allegations that, from 1999 through April 2006, she has been subjected to discrimination and harassment on the basis of her race (African-American) by various individuals in the workplace.  Compl. ¶ 14. She further contends that Ball State has done nothing to rectify the harassing environment, and instead, has retaliated against her for reporting the behavior.  Id. ¶ 51.


**Plaintiff's Complaints to Defendants Regarding Alleged Racial Discrimination**

Ball State bargaining unit employees, such as Ms. Vance, have a number of

---

[2] The parties dispute whether this selection constitutes a promotion or a demotion.  We address this issue more fully below.

avenues available to them to log complaints.  All complaints of discrimination or
harassment that are made by Ball State employees are forwarded to Ball State's Office of
Compliance, which coordinates the investigation and resolution procedure.  Courtright
Aff. ¶ 2.  The Office of Compliance maintains a record of all communications to and from
the office; phone calls are initially documented at the time the phone conversation occurs
and are also logged through an automated electronic filing system and all written
documentation is similarly logged upon receipt or dispatch.  Id. ¶ 3.  The Director of the
Office of Compliance is Sali Falling, an attorney, who oversees, among other employees,
Gloria Courtright, the Assistant Director of the Office of Compliance.  Id. ¶ 1.  Ms.
Courtright was the primary individual from the office involved with the investigation and
supposed resolution of Ms. Vance's claims of discrimination, harassment, and retaliation,
in coordination with Dining Services, UBC, and Employee Relations.  Id. ¶ 4.

     Although all complaints get forwarded to the Office of Compliance, Employee
Relations provides an additional avenue for bargaining unit employees, such as Ms.
Vance, to bring initial complaints.  Rubrecht Aff. ¶ 6.  Melissa Rubrecht, who was the
Assistant Director of Employee Relations for fifteen years and has acted as the Director
since July 1, 2006, coordinated Employee Relations' efforts to address Ms. Vance's
complaints with the efforts of the Office of Compliance.  Id. ¶ 1, ¶ 6.

     On November 7, 2005,[3] Ms. Vance filed her first complaint with Ball State,

_____

     [3] Ms. Vance dated her handwritten complaint October 20, 2005, but the Office of
Compliance did not receive it until the day on which it is date stamped, November 7, 2005.  BSU

alleging that on September 23, 2005, fellow employee Saundra Davis[4] threatened her and that Connie McVicker, another co-worker, called her racially derogatory names.  BSU 0050-0051.

*Service Elevator Incident*

In the November 7, 2005, complaint, Ms. Vance claimed that Ms. Davis stopped her as she was getting on the UBC service elevator and asked her, "When is this going to stop?"  Vance Dep. at 48-49.  Ms. Vance reported that although she did not know what Ms. Davis actually meant by that comment, she took it as a threat.  Id. at 49.  Ms. Vance also contends that Ms. Davis told her, "I'll do it again."[5]  BSU 0045.  Ms. Vance's complaint was not Ball State's first notice of this incident, however, because approximately six weeks earlier, on the very day of the alleged incident, Ms. Davis was the one who logged her own grievance with BSU regarding the elevator exchange with Ms. Vance.  See BSU 0044.  In her complaint, Ms. Davis alleged that it was Ms. Vance

_____

0050-0051.

[4] The parties dispute whether Ms. Davis is a co-worker or a supervisor.  We address this issue further below.

[5] According to Ms. Vance, this statement is in reference to a prior altercation she had with Ms. Davis in either 1999 or 2001, in which Ms. Vance alleges that Ms. Davis slapped her. However, Ms. Vance does not necessarily attribute the slap to racial motivation, as she testified that, "I don't know what provoked her to hit me."  Vance Dep. at 96.  Ms. Vance further contends that she reported the incident to her supervisors, Mr. Kimes and Ms. Adkins, when it happened, but that they took no disciplinary action.  Mr. Kimes and Ms. Adkins deny seeing or hearing about it.

who had acted in a threatening manner in the service elevator and had stated to Ms.

Davis, "Move, bitch. . . . You are an evil fucking bitch."  BSU 0045.

On the day Mr. Kimes received Ms. Davis's complaint, in September 2005, he

interviewed Ms. Davis and Ms. Vance, as well as Betty Skinner, another co-worker

whom Ms. Vance identified as a witness.  After completing the interviews, Mr. Kimes

concluded that his findings were inconclusive, as Ms. Davis and Ms. Vance had

conflicting accounts and Ms. Skinner could not corroborate either employee's version of

the events because she had not been present during the exchange.  See BSU 0046.  Thus,

on September 28, 2005, Mr. Kimes contacted the then-Director of Dining Services, Ann

Talley, by e-mail, detailing the results of his investigation and requesting guidance as to

how to resolve the situation.  BSU 000114.  After consulting other members of

management, Ms. Talley advised Mr. Kimes via e-mail that:

> I believe we can only counsel both employees as to showing proper respect
> for one another, never using unacceptable language, and taking problems to
> management for solution.  I do not believe we can apply policies subject to
> discipline because there were no witnesses and Vance denied saying words
> attributed to her by Davis.  There seems to be insufficient evidence of
> wrongdoing on the part of both women.

BSU 000113.  Consequently, in October 2005, Mr. Kimes spoke with Ms. Vance and told

her that the use of inappropriate language was not to be directed against another person,

but did not institute any discipline against her.  BSU 0058.  It is unclear whether Mr.

Kimes had a similar conversation with Ms. Davis following the incident, but we assume

so since that would have been consistent with Ms. Talley's directive.

6

*Racial Epithets*

Ms. Vance's November 7, 2005, complaint, also contained allegations that her co-worker, Ms. McVicker, had made racially derogatory comments about her.  Ms. Vance's written complaint was not the first time Ms. Vance had reported Ms. McVicker's behavior.  Two months prior, on September 26, 2005, Ms. Vance reported to her then-supervisor, Dave Ring, that she had heard that she had been called a "nigger" by her co-worker, Ms. McVicker.  BSU 0060.  On that same day, Mr. Ring told Mr. Kimes about Ms. Vance's allegations and Mr. Kimes immediately began an investigation.  Ms. Vance identified co-workers Jim Hiday, Amy Geesaman, Maria Julius, Brad Hutson, and Julia Murphy as potential witnesses, all of whom were subsequently interviewed by Mr. Kimes.  Although neither Ms. Vance nor any of the witnesses accused Ms. McVicker of using a racial epithet directly toward Ms. Vance, or otherwise in her presence, various witnesses stated that Ms. McVicker had previously used the word "nigger" in reference to African-American co-workers and Ball State students in the presence of other employees at Ball State and had on prior occasions told co-workers that she had "Klan" members in her family.  See BSU 0060-0064.

Up to this point, Mr. Kimes's investigation had been based solely upon Ms. Vance's verbal complaint.  However, on October 17, 2005, Ms. Vance requested a complaint form from Katie Skinner, an employee of University Compliance, which Ms. Vance later submitted on November 7, 2005, as described above.  See BSU 0047.  In her report following the conversation, Ms. Skinner noted that, when requesting the form to

7

make a written complaint, Ms. Vance stated that an employee had hit her a number of years before, but that she had never before reported it.  She also told Ms. Skinner that a co-worker "keeps saying she doesn't like 'niggers' and that she has relatives in the clan." Id.  Further, Ms. Vance stated that she "feels intimidated and feels that it is racial and she's afraid to be at work."  Id.

On October 20, 2005, two days after Ms. Vance's request for a written complaint form, Ms. Courtright and Mr. Kimes met again with Ms. Vance to discuss the verbal complaint she had made to Ms. Skinner.  Following that meeting, Ms. Courtright sent a letter to Ms. Vance assuring her that Mr. Kimes was currently investigating her complaints and would continue to do so.  BSU 0049.  After receiving Ms. Vance's written complaint on November 7, 2005, Ms. Courtright sent another letter to Ms. Vance, acknowledging receipt of the complaint and advising that, if Ms. Vance had any new information to bring forward as the investigation continued, she should feel free to do so. BSU 0057.

On November 11, 2005, then-Assistant Director of Employee Relations, Ms. Rubrecht, sent an e-mail to Gary Kramer, the Director of Employee Relations, and to Ann Talley, Director of Residence Dining Services, recommending that Ms. McVicker receive a written warning[6] as discipline for her conduct.  In the e-mail correspondence, Ms.

---

[6] According to Ball State's Employee Handbook, employees are generally subject to a four-step, progressive disciplinary policy that ranges from a verbal warning to discharge.  Ball State University Employee Handbook § 5.11.  Although a written warning, such as Ms. Rubrecht recommended, is generally a second-step disciplinary action, the Handbook provides that supervisors have discretion to determine which step to apply, based on the seriousness of the

Rubrecht stated that:

> I know we don't have specifics on exactly what and when these utterances
> were, just general complaints and time frames, but we need to make a
> strong statement that we will NOT tolerate this kind of language or
> resulting actions in the work place.  Therefore, I think we can justify going
> beyond our limited prior past history and issue a written warning . . . .  I
> think we should also strongly advise her verbally when we issue this that it
> must stop NOW and if the words/behavior are repeated, we will move on to
> more serious discipline up to an[d] including discharge.

BSU 00148.

In accordance with Ms. Rubrecht's recommendation, on November 11, 2005, Mr.

Kimes issued Ms. McVicker a written warning for "conduct which is inconsistent with

proper behavior."  BSU 0066.  The written warning provided that Ms. McVicker was

being disciplined because "[s]everal witnesses attested to [her] use of the word 'N*****'

in verbal reference to African-American students and co-worker[s]; [her] verbal reference

to family association with the Ku Klux Klan; and glaring, looking intently, or staring for

prolonged periods at co-workers, all which are unacceptable behaviors."  Id.  In the

warning, Ms. McVicker was instructed to "[i]mmediately cease unacceptable behaviors"

and was put on notice that "[f]uture violations of University rules or regulations will

result in further disciplinary action."  Id.

On that same day (November 11, 2005), Ms. Vance told Ms. Courtright that Ms.

---

infraction or other extenuating circumstances.  Additionally, the Handbook explicitly provides
that "threatening anyone, fighting, or the theft of employee, student, or university property are
particularly serious offenses and may result in the immediate discharge of the offending party."
Id.

McVicker had also referred to her (Ms. Vance) as a "monkey." BSU 00132. Ms. Courtright advised Ms. Vance to tell Mr. Kimes, which Ms. Vance did. However, Mr. Kimes was unable to corroborate Ms. Vance's account of the incident because Betty Skinner, a co-worker whom Ms. Vance said had overheard the racial slur, denied knowledge of any exchange. As a result, Mr. Kimes informed Ms. Vance that, without any witnesses, "proceeding further would diminish this to a she said-she said exchange that wouldn't result in anything positive, but that he would continue if [Ms. Vance] wanted him to." BSU 00133. Ms. McVicker was not given additional discipline based on this alleged incident. Resp. to Request for Admission No. 10.

On November 15, 2005, Ms. Courtright met with Ms. McVicker to discuss the written warning she had received from Mr. Kimes. In that meeting, although Ms. McVicker again denied the allegations, Ms. Courtright informed her that, "while she might not intend anything by her comments, they are perceived by co-workers in a very negative way and they are very inappropriate in the workplace." BSU 00136. In that meeting, Ms. Courtright also suggested that Ms. McVicker consider other available positions at BSU and in order to remove herself from the "charged" environment at UBC. Id. Finally, Ms. Courtright advised Ms. McVicker "not to talk to or make comments about [Ms. Vance] and to stay as far away as possible." BSU 00137. In an effort to maintain distance between Ms. Vance and Ms. McVicker, Mr. Kimes testified that, in 2005, he attempted to schedule alternating weekends for Ms. Vance and Ms. McVicker to work, although he concedes that, "[s]ometimes it didn't work out, but we tried." Kimes

10

Dep. at 50-51.

Ms. McVicker eventually bid on a different job in 2007, and was transferred from UBC to Cardinal Crossing, effective April 22, 2007, approximately a year and five months after the conversation between herself and Ms. Courtright.  Exh. W (Transfer Agreement).  Even though Ms. McVicker has switched departments, Ms. Vance contends that she still would encounter Ms. McVicker on a regular basis while fulfilling her duties collecting food product.  Vance Aff. ¶ 9.  Donn Knox, one of Ms. Vance's co-workers, concurred with Ms. Vance, testifying that Ms. Vance encounters Ms. McVicker "almost on a daily basis as much, probably more, as if she would if [Ms. McVicker] was driving the truck."  Knox Dep. at 31.

*Subsequent Complaints*

On December 28, 2005, Ms. Vance filed a claim for race discrimination[7] with the EEOC.  Since that date, Ms. Vance has reported to her supervisors subsequent complaints of harassment, intimidation, and threats involving, among other individuals, Ms. McVicker, Mr. Kimes, and Ms. Davis.

On April 23, 2007,[8] Ms. Vance filed a grievance against Ms. McVicker, alleging

---

[7] Ms. Vance's EEOC charge also included allegations of gender and age discrimination. However, these claims have not been pursued in this litigation.

[8] Ms. Vance also filed a complaint on May 10, 2006, in which she alleged a variety of other instances in which she felt she had been harassed.  Some of those include being "blocked" on the elevator by Ms. Davis, who allegedly "stood there with her cart smiling"; being left alone in the kitchen with Ms. Davis, who was smiling; being around Ms. McVicker and Ms. Davis

that, on April 21, 2007, as Ms. Vance was getting on the elevator in the basement, Ms.
McVicker was exiting the elevator and, as the doors were closing, Ms. McVicker
remarked, "Payback." Exh. II (April 23, 2007, IDF Form). BSU officials, including Mr.
Kimes, Ms. Adkins and Mr. Lewis, investigated this incident by interviewing both Ms.
Vance and Ms. McVicker. Ms. McVicker denied that the alleged exchange on the
elevator took place. Further, when Ms. Adkins, Ms. Lewis, and an union representative,
Lee Richardson, met with Ms. McVicker on April 26, 2007, Ms. McVicker reported that,
on April 23, 2007, (the day that Ms. Vance reported the "payback" incident), Ms. Vance
came down the stairs in Cardinal Crossing[9] and stated, "Just beginning bitch – you better
watch your house." Exh. OO (April 26, 2007, IDF Form). When asked whether she had
made such a comment, Ms. Vance denied the allegation. There were no witnesses to
either alleged event and it does not appear that either employee was disciplined in
connection with it.

On August 13, 2007, Ms. Vance called Ms. Rubrecht in Employee Relations to
report that, on August 10, 2007, she was on the elevator when the doors opened on the
third floor and Ms. Davis and another co-worker, Sondra Spears, were standing there.
According to Ms. Vance, Ms. Davis asked her, "Are you scared?" BSU 001993. Ms.

---

"with 3 gals of milk looking at me weird"; and being intimidated by Ms. Adkins who was "mean
mugging and following [Ms. Vance] into the dishroom starring [sic]." BSU 0013-15. BSU's
Office of Compliance investigated these incidents but ultimately took no disciplinary action.

[9] As mentioned above, Ms. McVicker was transferred to Cardinal Crossing (a separate
department from UBC, where Ms. Vance works) effective April 22, 2007.

Rubrecht told her to file a complaint, which Ms. Vance did on August 14, 2007.  She

listed Patsy Amos, who had been on the elevator with her at the time, as a witness.  Ms.

Amos confirmed that she recalled hearing Ms. Davis ask the question and that it was "like

she had a southern accent."  Exh. PP.  However, Ms. Amos could not confirm whether the

question was intended to be intimidating or even whether it was directed at Ms. Vance

because the elevator door was only partially open when she heard Ms. Davis's voice, so

she was uncertain whether Ms. Davis "was alone or speaking to someone else."  Id.

Although Ms. Davis denied the allegation, because Ms. Amos was able to substantiate

that Ms. Davis had made the comment, Mr. Lewis issued Ms. Davis a verbal warning on

September 24, 2007, directing her to "maintain appropriate workplace conversations and

conduct [herself] appropriately so as not to disrupt the workplace/aggravate co-workers."

BSU 002043.

      Also on August 14, 2007, Ms. Vance filed a complaint against Mr. Kimes, alleging

that, on August 7, 2007, he came into the kitchen and asked her if she could ship an order

at an earlier time.  She responded that she could, but according to Ms. Vance's written

grievance, "he continued walking toward me saying that's not what I asked you . . . his

eyes were big [and] he kept asking me the same question over and over saying I'll take

that as a yes . . . saying I don't understand what you said . . . getting louder and scary

looking."  BSU 001997.  When asked about the incident, Mr. Kimes stated that he stood

across the room from Ms. Vance and asked her about the shipment.  He alleges that she

did not respond even though she heard him, and so he asked her again.  When she did not

13

reply a second time, he said that he would take her silence as a yes.  BSU 001951.  Mr.

Kimes denied moving toward Ms. Vance or speaking in a loud and aggressive tone.

Brad Hutson, a co-worker whom Ms. Vance indicated had witnessed the incident,

largely confirmed Mr. Kimes's account.  He said that, although Ms. Vance nodded in

response to Mr. Kimes's inquiry about the shipment, "it is common for Kimes to repeat a

request to make certain an order change is properly acknowledged."  BSU 001952.  Mr.

Hutson also stated that Mr. Kimes stood in the same place throughout the exchange, that

he did not appear to be aggressive, and that he was not speaking in a loud voice.  Based

on this investigation, coupled with the facts that there was no evidence of racial

overtones, nor was Ms. Vance negatively impacted in terms of pay or job assignment, the

Office of University Compliance determined that "no reasonable basis exists to support

the allegation made by Vance that Kimes subjected her to unlawful discrimination."  Id.

**Plaintiff's Allegations of Retaliation**

On August 10, 2006, Ms. Vance filed a second EEOC charge, this time alleging

retaliation.  Subsequent to filing this charge, Ms. Vance has alleged instances of

retaliatory behavior, including suffering diminished duties, being required to work

through breaks and lunches without compensation, failing to be offered overtime hours,

and being subject to unfair discipline.

*Scheduling and Compensation*

On May 10, 2006, Ms. Vance filed a complaint against Mr. Kimes, alleging various instances of retaliation.  According to her complaint, on a number of occasions, she was required to work through her break and lunch periods, but in some instances, failed to get compensated for that extra time.[10]  BSU 00163-65; Vance Dep. 85-86.  Ms. Vance, testified that, although she did not make any official complaints at the time, she notified Mr. Kimes about the discrepancies and then, assuming he would take care of it, she "let it go."  Vance Dep. at 92.  According to BSU, its investigation revealed that Ms. Vance had not been required to work through significantly more breaks that any other employee in UBC and that Ms. Vance received corrected compensation, just as many other employees have received, when a payroll mistake had been made.  BSU 00165.

In that same complaint, Ms. Vance also claimed that Mr. Kimes did not give her the opportunity for overtime hours such as he gave other employees.  Mr. Kimes responded that Ms. Vance has refused overtime hours that he had offered her in the past and, as a part-time employee (which she was at the time), she was not guaranteed a set number of hours per week. BSU 00164.  BSU's Office of University Compliance determined that Ms. Vance had made prior complaints about overtime hours that predated the filing of her EEOC charge and had "expressed the she has a limited number of hours

---

[10] When an employee skips a break or works through lunch, he or she is asked to notify a supervisor in order to be paid for the extra time worked that day.  Kimes Dep. at 41-42.  Ms. Vance contends that she followed the established procedure, by notifying UBC's chef and Mr. Kimes.

per week that she prefers to work, and many times the overtime opportunities that exist

fall outside her preferred work hours."  BSU 00165.


*Diminished Kitchen Duties*

The kitchen staff at Ball State is divided into three levels – substitute (first level),

part-time (second level) and full-time (third level).  Kimes Dep. at 22.  As mentioned

previously, when she first began working at Ball State, Ms. Vance was hired as a

substitute and was subsequently promoted to part-time, and most recently, was selected

for a full-time position by Ms. Adkins.  According to Mr. Kimes, although the duties as a

kitchen staff employee vary (e.g., baking, prep work, event preparation), the nature of an

individual's duties is not necessarily based on the employee's level.  Kimes Dep. at 23.

Currently, UBC's chef, Shannon Fultz, is responsible for assigning the kitchen

staff daily tasks.  Id.  She gives the kitchen staff employees prep lists each day, which list

their duties for the day, but Mr. Kimes retains the authority to switch employees' duties if

the need arises.  Id. at 23-24.  Additionally, when UBC was without a chef in April 2006

and again between September 2006 and December 2006, Mr. Kimes was solely

responsible for creating the daily prep lists.  Id. at 35.  Mr. Kimes is also responsible for

the kitchen staff scheduling.  Id. at 38-39.  Employees may request a particular day off

during the week, but  all employees, even those that work full-time, do not always work

the same schedule from week to week.  Id. at 39.

According to Ms. Vance, before she bid on and received the full-time catering

16

position, she had performed most of the baking duties at UBC for approximately seven

years. See Vance Dep. at 31-35. However, Ms. Vance contends that, since she received

the full-time position in January 2007 (and after she filed her EEOC charges), she has not

been asked to perform baking duties, despite the fact that she has more experience with

baking than any other UBC employee and she routinely received compliments from her

clients and co-workers when she had been allowed to bake. Vance Aff. ¶¶ 29-30. Ms.

Vance contends that, once she received the full-time position, Mr. Kimes told her that,

from then on, she would "never come in at 5:00 in the morning, and [would] not do[] any

baking . . . and now [her] job is over in the salad area." Vance Dep. at 33. Ms. Vance

further testified that, in line with what Mr. Kimes told her, instead of being "in the bakery

area, doing two and three pages of work," her duties now consist of "just putting salads in

a bowl and putting dressings in a container." Id. Her co-worker, Mr. Knox, concurs that,

after she moved to a full-time position, Ms. Vance was no longer involved in the

preparation for "big dinners" but instead was assigned entry level duties, such as "cutting

up celery sticks." Knox Dep. at 34-35.


*Unequal Discipline*

On September 28, 2007, Ms. Vance was issued a verbal warning for inappropriate

behavior that she allegedly engaged in on September 4, 2007, (slamming a pan down

behind other employees) and on September 14, 2007 (splattering chicken noodles and

gravy on Ms. Davis). Exh. 41. Ms. Vance claims that she was issued this warning even

17

though she was not asked about the alleged gravy splattering incident until four days after it happened, and she denied splattering gravy on Ms. Davis, and no witnesses saw her do so. Vance Aff. ¶ 33, ¶¶ 35-36. In contrast, Ms. Vance contends that, when she reported incidents of harassment under similar circumstances (*e.g.*, no witnesses, allegations denied, etc.) against employees who had not filed EEOC charges, her supervisors failed to implement discipline against them.

**Plaintiff's Allegations Subsequent to the Briefing of the Cross Motions**

On March 12, 2008, following the filings by both parties in their briefings on the cross-motions, Ms. Vance filed supplemental affidavits and additional evidence in support of her motion for partial summary judgment and in opposition to BSU's motion for summary judgment.[11] In her supplemental affidavit, Ms. Vance testified that, on March 1, 2008, she was on a break with fellow employee, Mr. Knox, when she encountered Ms. Davis and Ms. Davis's daughter, Amanda, outside BSU's student center. According to Ms. Vance, Amanda asked her, "What the fuck are you looking at?" Vance Second Supp. Aff. ¶ 5. Ms. Vance contends that when she did not respond, Amanda stated, "You are a nigger, a fucking nigger. You are trying to get my mother fired. What

---

[11] On March 17, 2008, Defendants filed a Motion to Strike Plaintiff's March 12, 2008, submissions [Docket No. 125], denying all the allegations contained therein and contending that the submissions "are allegations about recent events which involve unnamed defendants who are not parties to this lawsuit; these new allegations thus concern events which do not appear in Vance's complaint and which have not been subject to response, discovery, or motion." Def.'s Br. at 2. For the reasons detailed more fully below, we GRANT Defendants' Motion to Strike.

are you gonna do about it?  I'll kick your ass."  <u>Id.</u> ¶ 7.  At that point, Ms. Vance testified

that Richard, Ms. Davis's husband, who had been waiting in the car, got out of the car

and told Mr. Knox that he was a "backstabbing nigger lover."  <u>Id.</u> ¶ 9.  Ms. Vance claims

that Ms. Davis stood by throughout these exchanges and laughed.  Although Mr. Knox

testified in his affidavit that he did not hear everything that Amanda said to Ms. Vance, he

corroborated Ms. Vance's account insofar as he testified that Amanda called Ms. Vance a

"fucking nigger" and that Mr. Davis had behaved as Ms. Vance had described.  Knox Aff.

¶¶ 7, 9-10.  According to their affidavits, both Ms. Vance and Mr. Knox reported the

incident to Mr. Kimes and to the Ball State Police Department.  Ms. Vance claims that,

rather than addressing the incident, Mr. Kimes told her to "get out of [his] face."  Vance

Second Supp. Aff. ¶ 12.5.

　　　Ms. Vance's March 12, 2008, submissions also contain two articles and

accompanying reader comments that appeared in the Ball State Daily News Online, the

online version of Ball State University's student newspaper.  The first article, "BSU

employee offers view on Dining racism," originally appeared on February 18, 2008, in

the "Forum" section of the newspaper.  It is written by one of Ms. Vance's co-workers,

Sarah Oakes,[12] and in it Ms. Oakes shares her view that, based upon her experiences

---

　　　[12] In her supplemental affidavit, filed on March 12, 2008, Ms. Vance alleged that, in
addition to writing the article, on March 1, 2008, Ms. Oakes was "lurking in [her] work area,
banging things loudly, and acting to intimidate [her]."  Vance Supp. Aff. ¶ 14.  According to Ms.
Vance, when she reported this behavior to her supervisor, Ana Lisa Padron, Ms. Padron told her
that, "this is a common kitchen."  <u>Id.</u> ¶ 15.  Ms. Vance contends that it was only after she told
Ms. Padron that she [Ms. Vance] was going to call the police that Ms. Padron escorted Ms.
Oakes out of the kitchen.  <u>Id.</u> ¶¶ 16-17.

working with Ms. Vance in the University's catering department, it is Ms. Vance who is a

racist.  Exh. 53 (Oakes Article).  The second article, captioned, "BSU employee claims

she was threatened," was published on March 5, 2008, in the "News" section.  The article

contains basic information regarding Ms. Vance's report to the Ball State Police

Department that she and a co-worker had been involved in a verbal altercation with two

other people not affiliated with the University.  Exh. 54 (Rush Article).  Ms. Vance also

submitted the comments readers posted in response to these articles – some of which are

sympathetic to Ms. Vance, while others are openly racist and even threatening.[13]  Ms.

Vance contends that the fact that the University has allowed the comments appearing on

the newspaper's electronic billboard to remain posted for its employees, its students, and

the public to see has only exacerbated her hostile work environment.

## Legal Analysis

### I.      Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

_____

[13] For example, one reader advises Ms. Oakes to "[b]ait [M]s. Vance into a physical
altercation, make sure others see her strike you first, then beat that loudmouth down, in self
defense."  Exh. 53 (Oakes Article Comments).  Another states that "[V]ance needs to go back to
the east side and sell some crack."  Id.

reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," id. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enter., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg,

870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

Courts often confront cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief.  "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." Kohl v. Ass'n of Trial Lawyers of Am., 183 F.R.D. 475 (D.Md.1998). Thus, in determining whether genuine and material factual disputes exist in this case, the Court has considered the parties' respective memoranda and the exhibits attached thereto, and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

## II.     Motion to Strike

On March 18, 2008, Defendants moved to strike Ms. Vance's March 12, 2008, submissions, contending that her supplemental filings consist of new factual allegations unrelated to her summary judgment motion and involving individuals not named as defendants.  Defendants assert that if Ms. Vance wishes to supplement her complaint

22

allegations, she is required to move to supplement her pleadings pursuant to Federal Rule

of Civil Procedure 15(d),[14] rather than attempting "an end run" around the rule in order to

prevent Ball State from defending against the new allegations.  Ms. Vance rejoins that she

is not attempting to supplement her complaint with additional claims or parties; rather,

she claims that she is merely providing new evidence directly relevant to her hostile

environment claim already briefed on summary judgment.

        We agree with Defendants that Ms. Vance's supplemental submissions lay out

facts pertaining to events that allegedly occurred at a time after her complaint was filed

and, in fact, after the pending summary judgment motions were fully briefed, even though

they arguably relate to a claim (hostile environment) advanced in the original pleading.

Thus, as Defendants contend, we find that these supplemental submissions come within

the purview of Rule 15(d).[15]  It is within the district court's discretion to either allow or

deny a supplemental pleading.  Twin Disc, Inc. v. Big Bud Tractor, 772 F.2d 1329, 1338

---

        [14] Rule 15(d) provides:

>       On motion and reasonable notice, the court may, on just terms, permit a party to
>       serve a supplemental pleading setting out any transaction, occurrence, or event
>       that happened after the date of the pleading to be supplemented.  The court may
>       permit supplementation even though the original pleading is defective in stating a
>       claim or defense.  The court may order that the opposing party plead to the
>       supplemental pleading within a specified time.

Fed. R. Civ. Pro. 15(d).

        [15] Accordingly, rather than merely filing the materials as additional evidence, Ms.
Vance's counsel should have moved to supplement the pleadings pursuant to Rule 15(d).
However, for purposes of this entry, we will proceed with the Rule 15(d) analysis as if Ms.
Vance's counsel had done so.

(7th Cir. 1985).  When a supplemental pleading facilitates the efficient administration of

justice, a court should allow it.  Griffin v. County Sch. Bd. of Prince Edwardy County,

377 U.S. 218, 226-27 (1964).  However, a supplemental pleading is properly denied

under Rule 15(d) when there is "any apparent or declared reason – such as undue delay,

bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies

by amendments previously allowed, undue prejudice to the opposing party by virtue of

allowance of the amendment, futility of the amendment, etc."  Harris v. Shuman, 1998

WL 967588, at *3 (7th Cir. 1998) (citing Foman v. Davis, 371 U.S. 178, 182 (1962);

Glatt v. Chicago Park District, 87 F.3d 190, 194 (7th Cir. 1996)).

       We find that, if we were to allow Ms. Vance to supplement her pleadings with

these additional allegations at this point in the proceedings, it would serve to substantially

delay the progress of this litigation and prejudice Defendants, as the deadlines for

dispositive motions and discovery relating to liability issues have long passed.[16]

Furthermore, as we discuss more fully below, the majority of her new allegations of

additional harassment are not even attributable to Ball State, and those that are do not

reach the level of significance required to entitle Ms. Vance to relief under Title VII.

Thus, even if we were to consider the allegations set forth by Ms. Vance in her

supplemental submissions, they would have no effect on our ultimate determination that

she is unable to survive summary judgment on her hostile environment claim.  For the

---

[16] Although the deadline for discovery relating to damages was extended to July 25, 2008, the deadline for discovery relating to liability issues passed on October 12, 2007.

foregoing reasons, we <u>GRANT</u> Defendants' Motion to Strike Ms. Vance's supplemental affidavits and supporting evidence, filed on March 12, 2008.

### III.    Title VII Claims

Title VII provides that "it shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Ms. Vance makes two related arguments – that she was subjected to a hostile work environment and that she was retaliated against for complaining about unlawful discrimination.  We address each of Ms. Vance's claims in turn below.

### A.    Hostile Work Environment

Ms. Vance contends that Ball State subjected her to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, due to her supervisors' direct behavior towards her as well as her supervisors' failure to take prompt remedial action to address her co-worker's alleged harassing behavior and her supervisors' failure to respond to her complaints regarding harassment she allegedly suffered at the hands of third parties.  Ball State denies all aspects of this claim, arguing that the alleged conduct by its employees was not

25

objectively hostile, that it was neither severe nor pervasive, that Ball State was not negligent in discovering or remedying the alleged harassment, and that there is no evidence, save for Ms. McVicker's conduct, that the alleged harassment was directed at Ms. Vance because of her race.

In Meritor Sav. Bank v. Vinson, 477 U.S. 57 (1986), the Supreme Court clarified that the "terms, conditions, or privileges of employment" language in Title VII encompasses *environmental* conditions of employment, and that the scope of the prohibition "is not limited to 'economic' or 'tangible' discrimination." Id. at 64. Therefore, a plaintiff may establish a violation of Title VII by proving that discrimination based on her being a member of a protected class has created for her a hostile or abusive work environment.  In order to rise to the level of a hostile work environment that is violative of Title VII, a plaintiff must show: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." Mendenhall v. Mueller Streamline Co., 419 F.3d 686, 691 (7th Cir. 2005).

In order to determine whether a working environment is hostile in this sense, courts may consider factors including "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Hilt-Dyson v. City of Chicago, 282 F.3d 456, 463 (7th Cir. 2002), cert. denied, 537 U.S.

26

820 (2002) (quoting <u>Faragher v.City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998)).

Conduct that is unpleasant, but is not severe or pervasive, will not constitute a hostile

work environment prohibited by Title VII.  <u>See</u> <u>Saxton v. American Telephone and</u>

<u>Telegraph Co.</u>, 10 F.3d 526, 533 (7th Cir. 1993).


### 1.    Whether Ms. Davis Is Ms. Vance's Supervisor

We begin our Title VII analysis with a preliminary issue.  As mentioned above, the

parties dispute whether Ms. Davis was a supervisor or merely a co-worker of Ms. Vance.

Because part of our subsequent analysis turns on this distinction, we address it at the

outset of our discussion.  For Title VII purposes, "[a] supervisor is someone with the

power to *directly* affect the terms and conditions of the plaintiff's employment."  <u>Rhodes</u>

<u>v. Illinois Dep't of Transp.</u>, 359 F.3d 498, 506 (7th Cir. 2004).  That authority "primarily

consists of the power to hire, fire, demote, promote, transfer, or discipline an employee."

<u>Hall v. Bodine Elec. Co.</u>, 276 F.3d 345, 355 (7th Cir. 2002) (citing <u>Parkins v. Civil</u>

<u>Constructors of Illinois, Inc.</u>, 163 F.3d 1027, 1034 (7th Cir. 1998)).

Here, Ms. Vance makes no allegations that Ms. Davis possessed any such power.

Instead, Ms. Vance contends only that Ms. Davis is "part of management because she

doesn't clock in."  Vance Dep. at 35.[17]  Beyond that assertion, Ms. Vance concedes that

---

[17] BSU asserts that Ms. Davis is not currently, nor has she ever been, a supervisor.
Rubrecht Aff. ¶ 9 ("At all pertinent times she has been an hourly employee serving as a catering
specialist.").

she does not actually know whether Ms. Davis was one of her managers because "one day she's a supervisor; one day she's not.  One day she's to tell people what to do, and one day she's not.  It's inconsistent."  Id. at 84.  Even assuming, as Ms. Vance contends, that Ms. Davis periodically had authority to direct the work of other employees, such power would still not be sufficient to establish a supervisory relationship for purposes of Title VII, as there is nothing in the record indicating that Ms. Davis had the ability to "hire, fire, demote, promote, transfer, or discipline" Ms. Vance.

It is well established under Seventh Circuit law that "[a]n employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context."  Rhodes, 359 F.3d at 506; see also Hall, 276 F.3d at 355 ("[T]he fact that an employer authorized one employee to oversee aspects of another employee's job performance does not establish a Title VII supervisory relationship.").  In both Rhodes and Hall, the harassers in question were determined not to be supervisors, despite having much more authority over other employees than Ms. Davis is alleged to have had here, including the power to direct the plaintiffs' work duties, provide input into their performance evaluations, recommend discipline, and train the plaintiffs and other less-experienced employees.  For the foregoing reasons, we find that, for purposes of this Title VII analysis, Ms. Davis was Ms. Vance's co-worker, not one of her supervisors.  On that premise, we address Ms. Vance's allegations against her.

### 2.    Supervisor Harassment

We first consider Ms. Vance's allegations against those persons who actually were her supervisors.  Defendants contend that the harassment Ms. Vance alleges she was subjected to by her supervisors was neither sufficiently severe nor pervasive to be actionable and that none of the alleged harassment was racial in character or purpose.  We agree.  For the reasons detailed below, we find that the incidents attributed to Ms. Vance's supervisors, Ms. Adkins and Mr. Kimes, are not sufficiently connected to Ms. Vance's race so as to satisfy the second element of the hostile environment analysis, nor are they sufficiently severe or pervasive to be considered objectively hostile.

In order for Ms. Vance to demonstrate that the harassment she alleges she experienced was based on her membership in a protected class, the conduct in question "must have a racial character or purpose to support a hostile work environment claim." Luckie v. Ameritech Corp., 389 F.3d 708, 713 (7th Cir. 2004) (citing Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345 (7th Cir. 1999)).  Our review of Ms. Vance's allegations that directly implicate Ms. Adkins leads us to conclude that the only complained-of incident was not of a racial character.  The only concrete allegation made by Ms. Vance against Ms. Adkins is that she (Ms. Adkins) "mean-mugged" and stared at Ms. Vance on one occasion while they were both in the kitchen.  Although it is obvious that Ms. Vance found this alleged behavior unwelcome, no reasonable jury could find that this incident was racial in character or purpose.  Further, neither this event nor the others complained of by Ms. Vance was sufficiently severe or pervasive to be actionable.  There

is no evidence in the record to suggest that Ms. Adkins consistently engaged in this sort of behavior, nor can we in any event conclude that the making of an unkind face is either physically threatening or humiliating.

The same holds true for the alleged harassment by Mr. Kimes. Ms. Vance contends that on one occasion Mr. Kimes physically stood in front of a doorway to keep her from leaving a room and on another occasion, when he did not hear her answer a question he had asked, he walked toward her and repeated the question over and over in a threatening manner. Vance Dep. at 100; BSU 001997. Although Ms. Vance was no doubt upset by these encounters, she has presented no evidence to support the conclusion that Mr. Kimes engaged in these behaviors because of her race. Ms. Vance also contends that Mr. Kimes consistently treats her more poorly than her co-employees by yelling at her, giving her less desirable shifts, and simply treating her differently. However, the factual record adduced here does not support the conclusion that, if true, such treatment is due to the fact that she is African-American. There appears to be agreement among Ms. Vance's co-workers that Mr. Kimes is often a difficult supervisor for whom to work and sometimes plays favorites among employees. Some of Ms. Vance's co-workers testified that Mr. Kimes's treatment of Ms. Vance resulted in "tension" in the work place (Amos Statement ¶ 11; Murphy Statement ¶ 20) and a "stressful work environment" (Ring Statement ¶ 9). However, they never attributed Mr. Kimes's treatment of Ms. Vance to her race. In fact, Ms. Amos specifically testified that she has "never heard or seen Bill

Kimes do or say something that indicates he is a racist, and I do not believe he is a racist." Amos Aff. ¶ 5.

Additionally, the facts before the Court demonstrate that Ms. Vance (for that matter, other African-American employees as well) are not Mr. Kimes's only targets. Butch Parker, one of Ms. Vance's former co-workers (who is also African-American), testified that, although Mr. Kimes has an "intimidating bullying type" personality and that "he seemed to have favorites" of which Ms. Vance was not one, Mr. Kimes treated a number of other employees equally badly regardless of race, including himself, Patsy Amos, David Ring, and Julie Murphy. Parker Dep. at 16-17, 19-24. Another of Ms. Vance's co-workers, Ms. Amos, testified similarly, stating that "Bill Kimes has favorites among the employees and picks on others. I believe he picks on Maetta Vance, me, and others. . . . He could pick on anyone depending on the day. This has caused a number of employees to leave, including Teresa Pickett, Denel Anderson, Deb Whitney, and Andrea, whose last name I do not recall." Amos Aff. ¶ 4, ¶ 6. While we obviously do not condone Mr. Kimes's difficult demeanor, it appears that he is an example of an "equal opportunity harasser" and, as such, his behavior falls outside the reach of Title VII. See, e.g., Holman v. Indiana, 211 F.3d 399, 403 (7th Cir. 2000) ("Because Title VII is premised on eliminating *discrimination*, inappropriate conduct that is inflicted on [all races], or is inflicted regardless of [race] is outside the statute's ambit.") (addressing sexual harassment).

31

Ms. Vance does attribute one comment to Mr. Kimes that has a racial character. She alleges that, on one occasion, Mr. Kimes told Ms. Courtright that his new employee (Butch Parker) is African-American and that he was "concerned that Maetta Vance will attempt to create an alliance with him."  Parker Dep. at 32-33.  However, this solitary comment, allegedly uttered on a single occasion outside the presence of Ms. Vance is insufficient to establish a hostile work environment, especially considering that there has been no allegation that Ms. Vance was even aware of the comment before she commenced this litigation.

Because there is no evidence allowing a jury to find that Ms. Adkin's and Mr. Kimes's alleged behavior was based on race or was sufficiently severe and pervasive to be considered objectively hostile, no issue of material fact exists as to whether one of Ms. Vance's supervisors contributed to the hostile environment of which she complains and this part of her Title VII claim must be dismissed.  We proceed next to address the harassment Ms. Vance contends she suffered at the hands of her co-employees.

### 3.      Co-Employee Harassment

Ms. Vance attributes various instances of race-based harassment to her co-workers, Ms. Davis and Ms. McVicker, which allegations we address below.

*Allegations Against Ms. Davis*

The majority of the incidents of alleged harassment on the part of Ms. Davis have no racial character or purpose, including, *inter alia*, Ms. Davis's alleged comment that she would "do it again"[18] and various other allegations of staring, laughing, and banging pots and pans in a noisy, irritating fasion.  Ms. Vance alleges only two incidents that could arguably be related to race.  On one occasion, Ms. Vance contends, she overheard Ms. Davis making a joke about Buckwheat and Sambo while looking at her (Ms. Vance). Another time, Ms. Vance reports that Ms. Davis asked, in a Southern accent, "Are you scared?"  However, assuming the truthfulness of these facts as we must, these two incidents are not sufficiently severe or pervasive to support a hostile environment claim. Further, even if they were, Ms. Vance must still meet the fourth prong of the hostile environment analysis, to wit, that there is a basis for employer liability.  That she is unable to do.

Employer liability "turns on whether the alleged harasser was the plaintiff's supervisor, instead of a mere co-worker."  Rhodes v. Illinois Dep't of Transp., 359 F.3d 498, 505 (7th Cir. 2004).  Employers are "essentially strictly liable if the employee's supervisor created the hostile work environment."  Mason v. Southern Illinois University

---

[18] Ms. Vance contends that this statement is in reference to a prior alleged altercation that took place either in 1999 or 2001 between Ms. Vance and Ms. Davis in which Ms. Vance alleges that Ms. Davis hit her.  Putting aside the statute of limitations problem (Ms. Vance filed her first EEOC charge on January 5, 2006, meaning that her actionable claims had to have occurred within 300 days prior to that filing, on or after February 8, 2005), there is no indication that, even if true, either of these incidents occurred because of Ms. Vance's race.

at Carbondale, 233 F.3d 1036, 1043 (7th Cir. 2000).  However, when the harasser is a co-employee, an employer can be held liable only if it has "been negligent either in discovering or remedying the harassment."  Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1032 (7th Cir. 1998) (quoting Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997)).  Once an employer is made aware of the problem, "the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring."  Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 978 (7th Cir. 2004) (quoting Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044, 1048 (7th Cir. 2000)).

There is no basis for employer liability based on either the Buckwheat and Sambo remarks or the allegedly racially-based comment.  Ms. Vance concedes that she probably did not mention that she had overheard the Buckwheat and Sambo references in any of her complaints, nor does she allege that Ball State was negligent in discovering the incident.  However, Ms. Vance did report the altercation during which Ms. Davis asked her if she was scared.  After investigating, Ball State determined that Ms. Vance's account was largely corroborated by the witness named by Ms. Vance.  Although the University did not consider the statement to be related to race, it nevertheless issued Ms. Davis a warning as a sanction for her conduct.  In light of the relatively innocuous nature of the encounter, we find that Ball State's discipline was reasonably calculated to foreclose subsequent harassment.  For the above reasons, we are unable to find that Ms.

Vance has adduced any issue of material fact concerning whether Ms. Davis contributed to the hostile environment to which she contends she was subjected.

*Allegations Against Ms. McVicker*

Ms. Vance contends, and Defendants concede, that Ms. McVicker used racially derogatory language, including referring to African-American employees and Ball State students as "niggers," and commenting about her [Ms. McVicker's] family's ties to the Ku Klux Klan. There is no doubt that Ms. McVicker's comments were and are clearly offensive; however, we find that, while deplorable, her behavior does not rise to the level of actionable harassment as defined under Title VII.

The Seventh Circuit recognizes that the use of the word "nigger" can be extremely disturbing to the listener and that, "while there is no 'magic number' of slurs that indicate a hostile work environment, [the use of] an unambiguously racial epithet falls on the 'more severe' end of the spectrum." Cerros v. Steel Technologies, Inc., 288 F.3d 1040, 1047 (7th Cir. 2002) (quoting Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 674-75 (7th Cir. 1993)). Thus, "a plaintiff's repeated subjection to or hearing that word could lead a reasonable factfinder to conclude that a working environment was objectively hostile." Hrobowski v. Worthington Steel Co., 358 F.3d 473, 477 (7th Cir. 2004).

In determining the severity of racial epithets, the Seventh Circuit also considers whether they were directed at or uttered in the presence of the plaintiff. Although still

relevant to the hostile work environment analysis, the Seventh Circuit has held that "when harassment is directed at someone other than the plaintiff, the impact of [such] 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff."  Smith v. Northeaster Illinois University, 388 F.3d 559, 567 (7th Cir. 2004).  Here, Ms. McVicker did not direct her comments at Ms. Vance, nor did Ms. Vance personally hear Ms. McVicker utter the word "nigger" or refer to her [Ms. McVicker's] family's connections with the Ku Klux Klan.  Instead, she heard of those things only through her co-workers.  As such, Ms. Vance was not repeatedly subjected to hearing that term directed at her, nor did she personally hear it uttered by Ms. McVicker.

Beyond the above allegations, Ms. Vance contends that Ms. McVicker called her a monkey on one occasion[19] and engaged in other unwelcome behavior, including staring, laughing, and making the remark "payback."  While Ms. McVicker's behavior is obviously offensive and unacceptable, we cannot find that these incidents, taken together, are sufficiently severe or pervasive to have created an objectively hostile working environment.

Further, even if we had concluded that the harassment Ms. Vance suffered at the hands of Ms. McVicker was sufficiently severe or pervasive to be objectively hostile, we would still have to find a basis for attributing liability to Ball State.  No such basis exists

---

[19] One of Ms. Vance's co-workers, Ms. Amos, testified that she heard Ms. McVicker call Ms. Vance a "porch monkey" on another occasion.  Amos Aff. ¶ 7.  However, Ms. Amos did not report this incident to any of her supervisors.  Additionally, it is unclear from the record exactly when Ms. Amos heard Ms. McVicker make this statement or whether Ms. Vance was aware of this statement before the commencement of the instant litigation.

here.  After learning that Ms. McVicker was using racially derogatory language and verifying that allegation through an investigation, Ball State took disciplinary action against Ms. McVicker.  As discussed above, Ball State utilizes a four-step progressive discipline plan according to which a verbal warning is normally the first step.  Not only did Ball State decide that Ms. McVicker's behavior was sufficiently severe to warrant a second-step written warning, but Ms. Courtright also took Ms. McVicker aside to talk to her further about her conduct and suggest that Ms. McVicker consider bidding on a different job so that she and Ms. Vance could remain separated.[20]  Additionally, although not always successful, Mr. Kimes undertook to try to schedule Ms. McVicker and Ms. Vance on separate shifts so that their contacts with one another would be further limited.

Ms. Vance contends that, even after the discipline, Ms. McVicker continued to harass her (staring and laughing at her, saying "payback" on the elevator, and calling her a monkey) and that Ball State should have taken additional corrective action, such as separating her from Ms. McVicker sooner or terminating Ms. McVicker for her behavior in order to prevent future harassment.  However, Ball State is not held to such a standard in avoiding liability under Title VII.  As the Seventh Circuit has ruled, "Title VII does not require that the employer's responses to a plaintiff's complaints of . . . harassment

---

[20] Ball State contends that it transferred Ms. McVicker to another department in order to address the problems with Ms. Vance.  However, Ms. Vance's original complaint was made in 2005 and Ms. McVicker did not transfer to Cardinal Crossing until 2007.  Additionally, it appears that transfer was instigated by Ms. McVicker's decision to bid on the job, rather than on any action taken by Ball State.  Therefore, we do not include the fact of Ms. McVicker's transfer in our analysis of the disciplinary measures taken by Ball State.

successfully prevented subsequent harassment, only that the employer's actions were reasonably likely to check future harassment."  Savino v. C.P. Hall Co., 199 F.3d 925, 933 (7th Cir. 1999) (citations omitted) (addressing sexual harassment).  On the basis of the evidence adduced here, we find that Ball State's preventative measures were reasonably calculated to foreclose subsequent harassment.

Ms. Vance contends that she continued to complain about additional harassment inflicted by Ms. McVicker after she [Ms. McVicker] received the written warning and Ball State failed to address her concerns.  However, the factual record does not support such a factual finding.  Ms. Vance claims that Ms. McVicker called her a monkey at some time subsequent to her initial complaint and that she reported the incident the same day that Ms. McVicker received her written warning, but Ball State never issued Ms. McVicker further discipline and apparently did not take her complaint seriously.  However, the record reflects that Mr. Kimes investigated the incident and interviewed the witness whom Ms. Vance had identified, but when inquired of, the witness could not corroborate Ms. Vance's account.  Mr. Kimes reported back to Ms. Vance that, because there were no witnesses to substantiate her claim, it was merely a "she said-she said exchange."  Nevertheless, he offered to continue to pursue the issue if she wanted him to do so.  Ball State took similar actions with respect to the remainder of Ms. Vance's complaints (none of which involved racial epithets or racially derogatory language), thoroughly investigating the alleged incidents and interviewing the named witnesses.  Ms. McVicker denied the later allegations and in response levied her own set of accusations

38

against Ms. Vance.  Because Ball State could not corroborate either Ms. Vance's or Ms.

McVicker's accounts, no further disciplinary action appears to have been taken against

Ms. McVicker.  Under these facts, there is but one conclusion: Ball State properly

investigated the incidents and, when possible and as necessary, took prompt and

appropriate action reasonably calculated to prevent the harassment from recurring.

For the foregoing reasons, we hold that the harassment Ms. Vance alleges she was

subjected to by her co-workers is neither sufficiently severe nor pervasive to be

considered objectively hostile for the purposes of Title VII.  Additionally, even if it were,

we are unable to attribute liability to Ball State because we cannot find that it was

negligent either in discovering or remedying the harassment.[21]  Thus, we <u>DENY</u>

---

[21] In her March 12, 2008, submissions, Ms. Vance set forth various allegations of harassment against third parties, including Ms. Davis's family members and a number of anonymous individuals who posted racially derogatory comments on the website of Ball State's online student newspaper, contending that Ball State should be held liable for its failure to take action to address these incidents.  Although we have stricken those submissions from the record for reasons previously discussed, even had we considered them in our analysis, they would have had no affect on the result reached.

According to the EEOC guidelines, an employer may be responsible for the acts of non-employees, with respect to racial discrimination in the workplace, where the employer knows or should have known of the conduct and fails to take immediate and appropriate corrective action, *depending on the control and other legal responsibility the employer may have over such non-employees*.  <u>See</u> 29 C.F.R. § 1604.11(e) (emphasis added).  Here, Ball State could not be held liable for the third party actions alleged by Ms. Vance because the University had no control over the alleged perpetrators.

Although Ms. Vance claims that Ms. Davis was present when the incident involving Ms. Davis's family occurred, the racially derogatory language was allegedly uttered, not by Ms. Davis or another Ball State employee, but by private citizens over whom the University apparently had no control.  Additionally, the alleged confrontation took place outside of the workplace, while Ms. Vance was on a break, with none of Ms. Vance's supervisors present.  Ms. Vance has made no allegation that, by the time Ms. Vance reported the incident to Mr. Kimes, she was still being harassed by Ms. Davis's family, or even that Ms. Davis's husband and daughter were still on the premises.  As Judge Hamilton recognized in <u>Fulmore v. Home Depot,</u>

Plaintiff's Partial Motion for Summary Judgment and <u>GRANT</u> Defendants' Motion for

Summary Judgment on Ms. Vance's hostile environment claim.[22]

### B.     Retaliation

Ms. Vance also claims that Ball State unlawfully retaliated against her, when she

received less significant kitchen duties, fewer opportunities for overtime hours, and was

subject to unequal discipline subsequent to her having filed her EEOC charges.  Under

Title VII, it is unlawful "for an employer to discriminate against any of [its] employees ...

because [the employee] has opposed any practice made an unlawful employment practice

by [Title VII]."  42 U.S.C. § 2000e-3(a).  A plaintiff has two methods of proof available

to him or her to demonstrate retaliation.  A plaintiff may prove retaliation either through

---

<u>U.S.A., Inc.</u>, "While the racial harassment of employees by [third parties] is deplorable and not to be tolerated, neither this court nor any other has imposed upon employers the obligation to reprimand or otherwise punish [third parties] over whom they have no control for harassing behavior when the employee is no longer being subjected to the harassment."  2006 WL 839464, at *17 (S.D. Ind. March 30, 2006).

The same analysis applies to the anonymous online posters.  Ball State has no effective control over what anonymous individuals post on an electronic billboard.  In addition, efforts to impose such controls would clearly implicate First Amendment concerns.  In short, such comments are not attributable to Ball State, and the University is not liable under Title VII merely for its failure to remove the offending material.

[22] Under the same facts relied upon for her hostile environment claim, Ms. Vance brought suit against Defendants, Ms. Adkins, Mr. Kimes, Ms. Davis, and Ms. McVicker, in their individual capacities, pursuant to § 1983.  Because claims brought pursuant to § 1983 generally follow the contours of Title VII claims, the Seventh Circuit holds that such claims "should be analyzed in the same way and the same standard of liability should be imposed."  <u>Burks v. Wisconsin Dep't of Transp.</u>, 464 F.3d 744, 751 n.2 (7th Cir. 2006) (citations omitted).  Therefore, we also <u>GRANT</u> Defendants' Motion for Summary Judgment on the § 1983 individual capacity claims.

the direct method of proof or the indirect method, also called the "burden-shifting"

method.  See Tomanovich v. City of Indianapolis and Indiana Dep't of Transp., No. 05-

1653, slip op. at 6 (7th Cir. Aug. 8, 2006); Moser v. Ind. Dep't of Corr., 406 F.3d 895,

903 (7th Cir. 2005).  The parties appear to have addressed only the indirect framework in

their briefs, so we shall follow their lead and proceed solely with that analysis.

Under the burden-shifting method, an employee must establish a *prima facie* case

of retaliation by proving that she: "(1) engaged in a statutorily protected activity; (2) met

her employer's legitimate expectations; (3) suffered an adverse employment action; and

(4) was treated less favorably than similarly situated employees who did not engage in

statutorily protected activity."  Caskey v. Colgate-Palmolive Co., 535 F.3d 585 (7th Cir.

July 24, 2008) (citing Nichols v. Southern Illinois University-Edwardsville, 510 F.3d 772,

784-85 (7th Cir. 2007)).  If the plaintiff can establish the existence of these four factors,

the burden of production shifts to the employer to demonstrate a valid non-discriminatory

reason for the action it took against the plaintiff.  Id..

If the employer can demonstrate such a valid reason, the burden of production

shifts back to the plaintiff to demonstrate that the reason given was merely a pretext for

the unlawful retaliation.  Tomanovich at 7 (citing Moser, 406 F.3d at 904).  "A plaintiff

can establish pretext by showing either that a discriminatory reason more likely motivated

the employer or that the employer's proffered explanation is unworthy of credence."

Rand v. CF Industries, Inc., 42 F.3d 1139, 1145 (7th Cir. 1994).  As this Court has noted

previously, "A 'pretext' is not merely a mistake or an imprudent reason; it is a false

reason or a dishonest explanation, which, because of its falseness or dishonesty, raises a question as to whether the employer is hiding a discriminatory motive." Rice v. Indiana State Police, 149 F.Supp.2d 573, 581 (S.D. Ind. 2001).

### 1.    Diminished Kitchen Duties

Ms. Vance contends that in retaliation for the charges she filed with the EEOC, when she became a full-time employee in January 2007, her supervisors reassigned her to tasks in the kitchen that were menial and less significant compared to her prior duties. Since that time, Ms. Vance asserts that Mr. Hutson, who has the same position and job description as Ms. Vance, is consistently asked to direct the preparation of entire meals even though he does not have as much experience as Ms. Vance.[23]  Ball State rejoins that Ms. Vance is unable to make a *prima facie* case of retaliation because she has not shown that she suffered an adverse employment action, nor has she identified a similarly situated employee who received more favorable treatment.

Initially, Defendants assert that Ms. Vance is unable to cite any termination, reduction in pay, demotion, failure to promote, or any other such material change in her employment that would constitute an adverse employment action.  Instead, Ball State highlights the fact that, in the midst of Ms. Vance's allegations that she was being

---

[23] Ms. Vance also claims, quite cursorily, that Ms. Davis has been given the baking duties that were previously hers.  Even if this argument had been fully developed, we are unable to find that Ms. Vance and Ms. Davis are sufficiently similar for Title VII purposes because they do not hold the same position (Ms. Vance is a Catering Assistant, while Ms. Davis is a Catering Specialist).

subjected to harassment based on her race, she bid on and received a full-time catering position (she had previously been part-time), which included approximately $9,492.00 in annual benefits that she had not received as a part-time employee.  Ms. Vance does not dispute these facts, but contends that, despite receiving the full-time position, she has nevertheless suffered an adverse employment action because she was reassigned from complex baking tasks to entry level work.

It is true that the Seventh Circuit recognizes that "reassignment with significantly different responsibilities" can be an actionable adverse employment action.  See Stutler v. Illinois Dep't of Corrections, 263 F.3d 698, 703 (7th Cir. 2001).  However, the Supreme Court has made it clear that "reassignment of job duties is not automatically actionable." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 72 (2006).  The determination is fact-specific and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Id. (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)).  Although a close call, we find that a jury could reasonably conclude that the kind of complete reassignment of responsibilities Ms. Vance has described would have been materially adverse to a reasonable employee, considering that baking duties likely require more qualifications and would be considered more prestigious than the entry level work to which Ms. Vance contends she was assigned.

However, we are unable to find that Ms. Vance has met the fourth prong of the *prima facie* analysis, to wit, that she was treated less favorably than a similarly situated

43

employee who did not engage in statutorily protected activity.  Although Ball State

appears to concede that Ms. Vance and Mr. Hutson are similarly situated for purposes of

this claim, it contends that Ms. Vance is nevertheless unable to demonstrate that Mr.

Hutson received more favorable treatment than she, since they both received the same

types of assignments in the kitchen.  Ms. Vance alleges that she had been relegated to

cutting vegetables and preparing salads, while Mr. Hutson was given the responsiblity for

preparing entire meals; however, the documentary evidence in the record does not support

this contention.  The chef, Shannon Fultz, prepares daily "prep sheets" for every

employee for each work day, detailing the assignments.  Our review of the prep sheets

prepared by Ms. Fultz for Ms. Vance and Mr. Hutson from February 2007 to August 2007

reveals no significant differences.  While it is true that Ms. Vance and Mr. Hutson were

not always assigned identical tasks each day, both were given substantially similar

responsibilities that included a combination of easier and more complex tasks to complete

on a daily basis.[24]  For example, both Ms. Vance's and Mr. Hutson's daily prep sheets

included entry level tasks such as preparing salads and cutting fruit or vegetables, but

they also both received assignments to prepare more complicated entrees and side dishes.

See Exh. JJJ and Exh. LLL.  On the whole, we see no meaningful differences that could

---

[24] Additionally, even if, as Ms. Vance claims, the prep sheets did not always reflect the work that actually wound up being done (because tasks can be reassigned by Mr. Kimes and Ms. Fultz), the fact that Ms. Vance and Mr. Hutson may occasionally receive different assignments is not sufficiently significant to alter our analysis.

44

lead a reasonable jury to conclude that Mr. Hutson received more favorable assignments than Ms. Vance.

Because our review of the record does not disclose any genuine issues of material fact regarding whether Ms. Vance received less favorable treatment than did Mr. Hutson, we GRANT Defendants' Motion for Summary Judgment on Ms. Vance's claim that Ball State retaliated against her by reassigning her to more menial tasks in the kitchen.

### 2.   Overtime Hours

Ms. Vance next claims that Ball State retaliated against her by giving her fewer overtime hours than her co-worker, Mr. Hutson.[25]  Ball State does not dispute that there is a discrepancy between Ms. Vance's and Mr. Hutson's overtime hours.  However, the University contends that this is due, not to retaliation, but to the fact that Ms. Vance was often unavailable to work overtime hours.  Ball State also asserts that, because Ms. Vance was absent from work significantly more often than Mr. Hutson, the two cannot be considered similarly situated.  We agree that Ms. Vance's claim that Ball State retaliated against her by affording her fewer overtime hours than Mr. Hutson fails because Ms. Vance is unable to demonstrate that Mr. Hutson is similarly situated to her, as required by

---

[25] Ms. Vance also alleges that, on a number of occasions, she worked through her lunch hour or breaks but was not compensated for that time.  However, after a careful review of the record, we find no substantiation for this contention.

the fourth prong of the indirect analysis.[26]  Additionally, even if Ms. Vance had made out

a *prima facie* case of retaliation, she has been unable to show that Ball States's proffered

explanation for the hours discrepancy between Ms. Vance and Mr. Hutson is mere

pretext.

     In order for an employee to be similarly situated to a plaintiff for purposes of

proving a Title VII retaliation claim, a plaintiff "must show that there is someone who is

directly comparable to her in all material respects."  Patterson v. Avery Dennison Corp.,

281 F.3d 676, 680 (7th Cir. 2002).  While "[a] similarly situated employee need not be

'identical,' . . . the plaintiff must show that the other employee dealt with the same

supervisor, [was] subject to the same standards, and had engaged in similar conduct

without such differentiating or mitigating circumstances as would distinguish [her]

conduct or the employer's treatment of [her]."  Caskey, 535 F.3d at 585 (citations

omitted).  There is no dispute that Ms. Vance and Mr. Hutson shared the same supervisor

and were subject to the same standards in the workplace.

---

[26] The parties do not address the issue of whether a denial of overtime constitutes an adverse employment action sufficient to implicate Title VII.  Although it does not appear that this issue has been directly addressed by the Seventh Circuit, the Court of Appeals has held "that a denial of a raise can be an adverse employment action while the denial of a 'more transient' payment such as a bonus is not."  Lewis v. City of Chicago, 496, F.3d 645, 653 (7th Cir. 2007) (citations omitted).  Further, the Seventh Circuit recognizes that, "[d]epending on the type of work, overtime can be a significant and recurring part of an employee's total earnings similar to a recurring raise or it could be insignificant and nonrecurring like a discretionary bonus."  Id. at 654.  It appears in this case, that Ball State's overtime opportunities are more similar to a recurring raise than a discretionary bonus, and therefore, we assume for purposes of this motion that Ms. Davis has suffered an adverse employment action.

However, unlike Mr. Hutson, Ms. Vance was often either absent from work or unavailable to work certain hours.  It is undisputed that Ms. Vance took fairly frequent leave, pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"), sometimes leaving unexpectedly in the middle of the day, other times calling in to report that she would not be able to work that day.[27]  Although the University is obviously prohibited from using Ms. Vance's exercise of her statutorily protected leave against her (Ball State approved the FMLA leave in each instance), if she is absent at times when overtime is needed, it follows that she would not have the opportunity to be offered the hours on those instances if she were not present at work or was unavailable to work the necessary hours.  There is no allegation that Mr. Hutson was similarly absent or unavailable at times when overtime was offered.  The fact that Ms. Vance was unavailable to work certain hours and absent from work significantly more often than Mr. Hutson differentiates Mr. Hutson from Ms. Vance, rendering them dissimilar for any relevant comparison.  Thus, because Ms. Vance is unable to identify a similarly-situated employee who received more favorable treatment and had not engaged in statutorily protected activity, she is unable to make out a *prima facie* case of retaliation.

Even if we had concluded that Ms. Vance had established an entitlement to proceed past the *prima facie* stage on her overtime hours claim, the burden would then

---

[27] For example, between January 1, 2007, and October 29, 2007, Ms. Vance took FMLA time (either a full day or a number of hours) on 70 different work days, out of approximately 215 possible days she could have worked. Exh. DDD (Absence Record).

shift to Ball State to provide a legitimate, nondiscriminatory reason for the discrepancy. Here, the University has done so, contending that the reason Mr. Hutson received more overtime hours than Ms. Vance is that he was present at work and available to take the hours on a more consistent basis.  Ms. Vance rejoins that Ball State's explanation is merely pretext for retaliation because even on the days when she has been available and not on FMLA leave, she did not receive the first offer to take overtime, despite having significantly fewer overtime hours than Mr. Hutson.[28]

However, Ball State introduced evidence of an "Overtime Agreement" between the University and the union, which contains, *inter alia*, a "work continuation" provision. Under this provision, when overtime is needed to complete a specific task, the bargaining unit employee who originally started the task during normal hours must be the employee who finishes that task, if it requires overtime hours.  Rubrecht Supp. Aff. ¶ 8 (citing Section 4.F of the Overtime Agreement).  It is only in situations when the work continuation provision does not apply that employees with fewer overtime hours receive priority.  Therefore, because Mr. Hutson was available for work more regularly than Ms. Vance, Mr. Hutson was more likely to be the only full-time catering assistant on duty on a given day, which often invoked the work continuation provision in Mr. Hutson's favor, affording him more opportunities for overtime.  Additionally, even on the days when Ms.

----

[28] Ball State keeps equalization charts of its employees' overtime hours because it is required to distribute overtime "as equitably as possible."  Rubrecht Supp. Aff. ¶ 7 (citing Section 4.A of Ball State's Overtime Agreement).

Vance was at work and could take the overtime, if the work continuation provision

applied in favor of Mr. Hutson, she still could not be offered the overtime over Mr.

Hutson, regardless of how many fewer hours she had.

Furthermore, as Ball State argues (and Ms. Vance does not dispute), Ms. Vance

initially raised the issue of her lack of overtime hours before she ever filed charges with

the EEOC, which further bolsters the University's claim that its unequal distribution of

overtime hours was not, in fact, in retaliation for Ms. Vance having engaged in a

statutorily protected activity.  In short, we find that a reasonable fact-finder could not

conclude that Ms. Vance's having received fewer overtime hours than Mr. Hutson was

more likely motivated by discriminatory reasons than by Ball State's legitimate

nondiscriminatory reason.  Thus, for the foregoing reasons, we <u>GRANT</u> Defendants'

Motion for Summary Judgment on Ms. Vance's retaliation claim pursuant to the overtime

hour discrepancy.

### 3.      Unequal Discipline

Ms. Vance also fails to make out a *prima facie* case for retaliation on her theory

that she was subject to unequal discipline following the filing of her EEOC charges.  In

support of this theory, Ms. Vance points to the fact that, on September 28, 2007, she was

issued a verbal warning for allegedly slamming a pan down behind another employee and

splattering gravy on Ms. Davis, even though Ms. Vance denied throwing gravy and no

witnesses saw her do so.  In contrast, Ms. Vance contends that, when she reported

incidents of harassment under similar circumstances (*e.g.*, no witnesses, allegations denied, etc.) against employees who had not filed EEOC charges, her supervisors failed to implement discipline against them.

Initially, we note that we are not convinced that BSU treated the complaint against Ms. Vance differently than it treated complaints brought by Ms. Vance against other employees. However, even if the complaint against Ms. Vance were treated more favorably on this occasion than her complaints against others, we cannot find that Ms. Vance has suffered an adverse employment action sufficient to evoke Title VII protections and remedies. "An 'adverse employment action' is an employment action that is likely to dissuade a reasonable worker from making or supporting a charge of discrimination." Matthews v. Wisconsin Energy Corp., ___ F.3d ___ , 2008 WL 2639152, at *9 (7th Cir. July 7, 2008) (citations omitted). The Seventh Circuit has made it clear that "not everything that makes an employee unhappy will suffice to meet the adverse action requirement. . . . Rather, an employee must show that material harm has resulted from . . . the challenged actions." Traylor v. Brown, 295 F.3d 783, 788 (7th Cir. 2002) (internal quotations omitted). In other words, "the challenged action must result in some significant change in employment status." Bell v. EPA, 232 F.3d 546, 555 (7th Cir. 2000). In the Seventh Circuit, a plaintiff must demonstrate that he or she was subject to "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly responsibilities, or a decision causing a significant change in benefits." Mackenzie v. Potter, 219 Fed. Appx. 500, 503 (7th Cir. 2007).

Here, Ms. Vance received only a verbal warning regarding the alleged behavior; she was not terminated or demoted, nor were her pay or benefits affected.  In short, Ms. Vance is unable to show that she suffered any material harm as a result of receiving a single verbal warning and consequently she is unable to satisfy the second prong of the indirect analysis, to wit, that she suffered an adverse employment action.  It is well established that, "[f]ailure to satisfy any one element of the prima facie case is fatal to an employee's retaliation claim."  <u>Sublett v. John Wiley & Sons, Inc.</u>, 463 F.3d 731, 740 (7th Cir. 2006) (quoting <u>Hudson v. Chicago Transit Authority</u>, 375 F.3d 552, 560 (7th Cir. 2004)).  Because Ms. Vance was unable to demonstrate that the verbal warning she received constituted an adverse employment action, we shall <u>GRANT</u> Defendants' Motion for Summary Judgment as to Ms. Vance's claim that the unequal discipline she faced was retaliatory.

## V.      Conclusion

For the reasons detailed above, we <u>DENY</u> Plaintiff's Motion for Oral Argument; <u>GRANT</u> Defendants' Motion to Strike; <u>DENY</u> Plaintiff's Partial Motion for Summary Judgment; and <u>GRANT</u> Defendants' Motion for Summary Judgment in its entirety.  Final judgment will be entered accordingly.

IT IS SO ORDERED.


Date:   09/10/2008

_SARAH EVANS BARKER, JUDGE_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Lester H. Cohen
DEFUR VORAN
lhcohen@charter.net

Raegan Mackenzie Gibson
DANN PECAR NEWMAN & KLEIMAN
rgibson@dannpecar.com

David E Kress Jr.
DANN PECAR NEWMAN & KLEIMAN PC
dkress@dannpecar.com

Shawn A. Neal
DE FUR, VORAN, HANLEY, RADCLIFF & REED, LLP
sneal@defur.com

Brian M. Pierce
DEFUR VORAN HANLEY RADCLIFF & REED
bpierce@defur.com

Scott E. Shockley
DEFUR VORAN
sshockley@defur.com

Mark Richard Waterfill
DANN PECAR NEWMAN & KLEIMAN
mwaterfill@dannpecar.com